```
                                                              USDC SDNY
                                                              DOCUMENT
                                                              ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT                                  DOC #: _____
SOUTHERN DISTRICT OF NEW YORK                                 DATE FILED: 8/26/2015
------------------------------------------------------------- X
  TONICA EMMANUEL,                                            :
                                                              :
                                    Plaintiff,                :
                                                              :          1:13-cv-2894-GHW
                   -v -                                       :
                                                              :          MEMORANDUM OPINION
  CUSHMAN & WAKEFIELD, INC., et al.,                          :              AND ORDER
                                                              :
                                    Defendants.               :
------------------------------------------------------------- X
```

GREGORY H. WOODS, United States District Judge:

Plaintiff Tonica Emmanuel, through counsel, brought this action against Defendants Cushman & Wakefield, Inc. ("Cushman"), Nancy Lara, and Charlene Coger, alleging that Defendants terminated her employment based on her pregnancy status and retaliated against her for engaging in protected conduct, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k); and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8–107 *et seq.*[1]  Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 with respect to all of Emmanuel's claims.

I.   **Background**[2]

Cushman is a global commercial property and real estate services company.  Dkt. No. 32-3 (Declaration of Nancy Lara) ("Lara Decl.") at ¶ 2.  Emmanuel worked for Cushman as a receptionist at a building owned by Scholastic, a publisher and distributer of children's books.  Dkt. No. 32-5

---

[1] In her complaint, Emmanuel also raised a disability discrimination claim under the Americans with Disabilities Act and at least arguably raised a hostile work environment claim under Title VII.  Emmanuel, however, has abandoned those claims by failing to oppose Defendants' arguments in support of their dismissal.  *See Jackson v. Federal Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("In the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").  Emmanuel's disability discrimination and hostile work environment claims are thus dismissed as abandoned.

[2] In light of the applicable summary judgment standard, the following facts are derived from the exhibits attached to the parties' Rule 56.1 Statements of Undisputed Fact relied on by Emmanuel, and from the undisputed portions of those exhibits relied on by Defendants.

(Emmanuel Deposition Transcript) ("Emmanuel Dep.") at 42-43.  Defendant Nancy Lara was the Senior Property Manager for Cushman's Scholastic account and had overall responsibility for the management of Scholastic's buildings.  Dkt. No. 32-4 (Nancy Lara Deposition Transcript) ("Lara Dep.") at 16-17.  Defendant Charlene Coger was a telephone operator for Cushman on the Scholastic account.  Dkt. No. 32-7 (Coger Deposition Transcript) ("Coger Dep.") at 35-38.  Coger also had the title of Supervisor, had "some responsibility for the oversight of the receptionists and other operators on the Scholastic account," Dkt. No. 32-6 (Coger Declaration) ("Coger Decl.") at ¶ 3, and was "responsible for giving out any verbal discipline that was required," Lara Dep. at 43.  Additionally, Lara would consult Coger prior to taking any disciplinary action against the receptionists or operators on the Scholastic account, including Emmanuel.  *Id.* at 146-47.  Coger, however, did not have the authority to hire, fire, adjust employee grievances, or issue written discipline.  Coger Decl. at ¶ 4; Lara Decl. ¶ 4.

Emmanuel initially started working for Cushman in May 2009 as a temporary employee hired through a staffing agency.  Emmanuel Dep. at 39, 42.  During Emmanuel's interview for a temporary position, Coger asked Emmanuel whether she had any children, Coger Dep. at 134-35, 146-47, which she answered in the negative, Emmanuel Dep. at 42.  Coger asked this question because it was "anticipated that if someone had children, they might have problems with [working] the hours between eight and seven."[3]  Coger Dep. at 134-35.  Emmanuel was hired as a permanent Cushman employee in August 2009.  Emmanuel Dep. at 42.

---

[3] Emmanuel testified that a woman named Marabelle confided in her that she believed that she had been denied a position at Cushman because she had a child, and that co-worker Elizabeth Moreno had also told Emmanuel that Marabelle had been denied a position at Cushman because she had a child.  Emmanuel Dep. at 42-43, 47, 156-57.  Defendants have properly objected to Emmanuel's testimony as to Marabelle's and Moreno's statements as inadmissible hearsay, *see* Dkt. No. 39-1 at ¶¶ 1-2, and Emmanuel has not shown that admissible evidence as to the statements at issue will be available at trial.  As a result, the Court cannot consider these statements in ruling on Defendants' summary judgment motion.  *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (noting that a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment, absent a showing that admissible evidence will be available at trial" (citations omitted)).

In or around October 2011, Emmanuel informed Coger that she was pregnant. Coger Dep. at 138-39. Because Emmanuel had previously confided in Coger that she had terminated earlier pregnancies, Coger was unsure of how to react. Coger Decl. at ¶ 5. Coger asked Emmanuel whether she intended to keep the baby. *Id.* After Emmanuel replied that she did intend to keep the baby, Coger said "'watch your back' or 'watch yourself in here' or something [of] that nature." Emmanuel Dep. at 117.

In January 2012, while at work during business hours, Emmanuel posted the following message on Facebook: "The day my pregnancy was announced ppl [sic] at my job started to try and make my life a living hell. They don't realize it's a mission impossible." Dkt. No. 32-11. Nazaire reported Emmanuel's Facebook post to Coger. Coger Dep. at 108. Because Nazaire was upset about the content of Emmanuel's Facebook post, Coger reported it to Lara, *id.* at 108, 132-33, who in turn reported it to Human Resources. Lara Dep. at 90-91. Emmanuel subsequently received a written disciplinary warning stating that Cushman had "received a report of an insulting nature that [Emmanuel] posted on a social networking site during work hours," and that both Cushman's and Scholastic's policies "prohibit participation in social networking during business hours, unless there is a specific definable function associated with such participation." Dkt. No. 32-10. According to Emmanuel, Lara had observed other employees, including Nazaire, posting on Facebook during business hours, yet those employees had not been disciplined. Emmanuel Dep. at 160-61. After receiving the above disciplinary warning, Emmanuel complained to Lara that she felt she was being discriminated against based on her pregnancy because other employees had posted on Facebook during business hours without being disciplined. *Id.* at 181.

In March 2012, an unidentified Scholastic employee reported to Debbie Singleton, a Cushman receptionist, that Emmanuel had been sleeping on a couch in the reception area during business hours. Coger Dep. at 64-65. Singleton reported this allegation to Coger, who reported it to Lara. *Id.* at 66-67. After Lara confronted Emmanuel with this allegation, Emmanuel admitted that

3

she had been sleeping on a couch in the reception area during business hours. Lara Decl. at ¶ 5; Emmanuel Dep. at 176-77. As a result of this incident, Lara sought the approval of Human Resources to terminate Emmanuel's employment. Lara Dep. at 79-81.[4] In a March 12, 2012 letter drafted by Lara, Cushman terminated Emmanuel's employment for sleeping in the reception area during business hours.[5] Dkt. No. 32-13. Coger played no role in the decision to terminate Emmanuel's employment. Coger Decl. at ¶ 4; Lara Decl. at ¶ 4.

The parties dispute whether other similarly situated employees were not disciplined for engaging in the same misconduct as Emmanuel. Emmanuel asserts that (1) "in or about May 2010, [she] personally informed [Coger] that Justine Sierra, Receptionist, was sleeping on the couch in the reception area . . . and [Coger] did not take any action against Justine Sierra"; and (2) "in or about May 2011, [Coger] personally observed Brille Williams, Receptionist, sleeping on the couch in the reception area . . . and also did not take any disciplinary action against her." Dkt. No. 37-1 (Emmanuel Declaration) ("Emmanuel Decl.") at ¶¶ 4-5. By contrast, Coger asserts that (1) "[t]he first time Emmanuel mentioned to [her] that Sierra had slept on the job was in March 2012, at which point Sierra was no longer performing work for Cushman"; and (2) she "never saw Brille Williams sleeping on the couch." Dkt. No. 39-2 at ¶¶ 6-7. It is undisputed, however, that Lara had never

---

[4] In her Rule 56.1 Counterstatement of Material Facts, Emmanuel asserts that "Defendant Lara . . . testified that without talking to [Emmanuel] or further investigating who it was that witnessed [Emmanuel] sleeping, Defendant Lara immediately brought it to the attention of Human Resources in an effort to get [Emmanuel] terminated." Dkt. No. 38 at pg. 9, ¶ 32 (citing Lara Dep. at 80-81). This assertion, however, is not borne out by the record. In the cited portion of her deposition transcript, Lara does not state when she requested permission from Human Resources to terminate Emmanuel's employment, *see* Lara Dep. At 80-81, and other portions of the record establish that she did so only after Emmanuel admitted that she had fallen asleep in the reception area, *see* Lara Decl. at ¶ 5 ("I confronted Emmanuel with the allegation and Emmanuel admitted that she had fallen asleep. Cushman & Wakefield terminated her employment as a result."); Dkt. No. 32-13 (Emmanuel's termination letter) (stating that Emmanuel had "admitted that [she was] sleeping on the couch").

[5] Emmanuel testified that co-workers Elizabeth Moreno and Brille Williams both told her that, according to Coger, Emmanuel was actually terminated for "attempting to go over [Coger's] head and make a complaint about discrimination." Emmanuel Dep. at 229. Defendants have properly objected to Emmanuel's testimony as to Moreno's and Williams's statements (regarding Coger's statement) as inadmissible hearsay, *see* Dkt. No. 39-1 at ¶ 19, and Emmanuel has not shown that admissible evidence as to the statements at issue will be available at trial. As a result, the Court cannot consider these statements in ruling on Defendants' summary judgment motion. *See Burlington Coat Factory*, 769 F.2d at 924.

received a complaint of an employee sleeping on the job prior to the incident involving Emmanuel. Lara Dep. at 96.

## II.   Analysis

### A.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "[c]onclusory allegations, conjecture, and speculation, . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

### B.   Title VII Pregnancy Discrimination Claims

As amended by the PDA, Title VII prohibits discrimination "because of or on the basis of pregnancy" and provides that "women affected by pregnancy . . . shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). In the absence of direct evidence of discrimination, courts apply the familiar *McDonnell Douglas* burden-shifting framework in analyzing claims under the PDA.[6]

---

[6] Although Emmanuel exclusively frames her arguments in opposition to summary judgment using the *McDonnell Douglas* "pretext" analysis, she also suggests, in passing, that the Court should apply the distinct "mixed-motive" analysis articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See* Dkt. No. 36 ("Emmanuel Opp.") at 4. The latter analysis applies only where a plaintiff has offered "direct evidence" of discrimination. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173-74 (2d Cir. 2006). Because Court finds that Emmanuel has not presented any direct evidence of discrimination for the reasons described below, her claims are analyzed under the *McDonnell Douglas* framework only. Applying a mixed-motive analysis, however, would not change the outcome in this case, since the two frameworks at issue "merely represent different methods of conceptualizing the same inquiry (whether an illegal discriminatory reason played a motivating role in an adverse employment decision)." *Forrester v. Prison Health Servs.*, No. 12-cv-363 (NGG), 2015 WL 1469737, at *16 (E.D.N.Y. Mar. 30, 2015); *see also Vahos v. Gen. Motors Corp.*, No. 06-cv-6783(NGG), 2008 WL 2439643, at *5 (E.D.N.Y. June 16, 2008) ("As there is no difference between the plaintiff's initial burden under *Price Waterhouse* and the plaintiff's ultimate burden under *McDonnelll Douglas*, and because the court will now determine

*Crisses v. Gucci Am., Inc.*, No. 10-cv-8393 (GBD), 2012 WL 3834634, at *5 (S.D.N.Y. Aug. 21, 2012). Under this framework, in order to establish a *prima facie* case of discrimination, the plaintiff must demonstrate that (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010). If the plaintiff satisfies this burden, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the adverse employment action. *Id.* at 492. If the employer does so, the presumption of discrimination raised by the *prima facie* case is rebutted, and the burden returns to the plaintiff to show that the employer's stated reason for the adverse employment action is merely a pretext for discrimination. *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

Here, it is undisputed that Emmanuel was a member of a protected class by virtue of her pregnancy and that the termination of her employment constituted an adverse employment action.[7] Defendants argue, however, that Emmanuel cannot establish that she was qualified to be receptionist or that her termination occurred under circumstances giving rise to an inference of pregnancy discrimination. *See* Dkt. No. 31 ("Def. Mot.") at 13-14. Defendants further argue that there was a legitimate non-discriminatory reason for Emmanuel's termination—her admitted falling asleep on a couch in Scholastic's reception area during business hours—and that she cannot establish that this stated reason was merely a pretext for discrimination. *Id.* at 14.

With respect to Emmanuel's qualifications, while Defendants concede that she was "initially qualified" for her position, *see* Dkt. No. 39 ("Def. Reply") at 4, they argue that "[s]leeping in the reception area made [her] unqualified for [her] position," Def. Mot. at 13. This argument is

---

whether [the plaintiff] has met his ultimate burden under *McDonnelll Douglas*, the court will not separately analyze his claims under *Price Waterhouse*.").

[7] With respect to both her discrimination and retaliation claims, Emmanuel does not contend that any of the other conduct complained of in this case constituted an adverse employment action. *See* Emmanuel Opp. at 7, 11.

frivolous. In order for a plaintiff to satisfy the "minimal" burden of demonstrating that she was qualified for her position, she must show only that she "possesses the basic skills necessary for performance of [the] job." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001). "The qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in [her] *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its [adverse employment] decision." *Id.* Defendants' argument relies on just such a shift. Emmanuel did not cease to possess the basic skills that initially rendered her qualified for her position simply because she fell asleep on the job on a single occasion. *See id.* at 91 (cautioning courts against conflating "qualified for the position" with "performing . . . duties satisfactorily").

With respect to whether Emmanuel's termination occurred under circumstances giving rise to an inference of pregnancy discrimination, "[a] plaintiff can establish an inference of discrimination through direct evidence of discriminatory intent, or through circumstantial evidence demonstrating that the employer treated plaintiff less favorably than a similarly situated employee outside of [her] protected group." *Guzman v. City of New York*, No. 1:13-cv-5445 (GHW), 2015 WL 1239988, at *8 (S.D.N.Y. Mar. 18, 2015) (internal quotation marks omitted). "Direct evidence" of discrimination "includes, *inter alia*, policy documents and evidence of statements or actions by decisionmakers that may be viewed as *directly reflecting* the alleged discriminatory attitude." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 173-74 (2d Cir. 2006) (internal quotation marks omitted) (emphasis in original). Direct evidence may also include evidence of discriminatory statements or actions by employees who, while not the ultimate decisionmakers, have "enormous influence in the decision-making process." *Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001); *see also Sadki v. Suny Coll. at Brockport*, 310 F. Supp. 2d 506, 513 (W.D.N.Y. 2004) ("[T]he element of causation—*i.e.,* that an adverse employment action was caused by discrimination—can be satisfied

by showing that a person with discriminatory animus toward the plaintiff influenced the 'actual' decisionmaker, even if the latter did not consciously discriminate against the plaintiff.").

In this case, Emmanuel suggests that the following constitutes direct evidence of discrimination: (1) Coger's testimony that she asked Emmanuel whether she had any children during her interview for a temporary position because it was anticipated that, if someone had children, they might have problems working between the hours of eight and seven; (2) Emmanuel's testimony that, after she told Coger that she was pregnant, Coger asked her whether she intended to keep the baby; and (3) Emmanuel's testimony that, after she replied that she did intend to keep the baby, Coger told her to "watch her back." *See* Dkt. No. 36 ("Emmanuel Opp.") at 7-8. Resolving any ambiguities in Emmanuel's favor, a reasonable juror could conclude that the above statements reflect a discriminatory bias on the part of Coger against pregnant employees. Thus, the question of whether direct evidence of discrimination exists in this case turns on whether the evidence permits a finding that Coger either participated in or influenced the decision to terminate Emmanuel's employment.

As Emmanuel notes, *see* Emmanuel Opp. at 8, there is evidence indicating that, as a general matter, Coger had a certain degree of supervisory authority over Emmanuel, *see* Coger Decl. at ¶ 3; Lara Dep. at 43, and Lara would consult with Coger prior to taking disciplinary action against Emmanuel, *see* Lara Dep. at 146-47. There is no evidence, however, that Coger consulted with Lara or otherwise played a role in connection with the specific decision to terminate Emmanuel's employment. To the contrary, apart from merely relaying to Lara an indisputably accurate report that Emmanuel had been sleeping on the job, it is undisputed that Coger "had no role" in the termination decision, which was made solely by Lara. Lara Decl. at ¶ 4; Coger Decl. at ¶ 4; Lara Dep. at 79-81; *accord* Dkt. No. 38 (Emmanuel's Rule 56.1 Counterstatement of Material Facts) at ¶ 68 (admitting that "Coger learned that Cushman & Wakefield was going to terminate Emmanuel's employment after it had made the decision"). As a result, the evidence suggesting that Coger was

8

biased against pregnant employees does not indicate that Emmanuel's pregnancy was a motivating factor in Lara's decision to terminate her employment. *See Joseph v. Owens & Minor Distribution, Inc.*, 5 F. Supp. 3d 295, 310 (E.D.N.Y. 2014) ("[A]bsent any evidence that [a co-worker] was involved in the decision to terminate Plaintiff, any racial bias or insensitivity on the part of [that co-worker] cannot be attributed to the actions of the decision-maker who terminated Plaintiff." (citing *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 222 (2d Cir. 2004)); *Meehan v. Davita, Inc.*, No. 3:08-cv-877 (WWE), 2010 WL 5211487, at *7 (D. Conn. Dec. 16, 2010) ("[A] stray remark by an employee does not prove discriminatory animus unless there is a causal connection to plaintiff's alleged adverse employment action.").

In any event, even assuming, *arguendo*, that Emmanuel could establish that her termination occurred under circumstances giving rise to an inference of pregnancy discrimination (through direct evidence or otherwise), Cushman has articulated a legitimate, nondiscriminatory reason for its decision to terminate her employment—falling asleep on a couch in the reception area during business hours—and Emmanuel cannot establish that this stated reason was a pretext for discrimination. As indicated, Emmanuel admitted to Lara that she had fallen asleep on a couch in the reception area during business hours, *see* Lara Decl. at ¶ 5; Emmanuel Dep. at 176-77, and Lara testified the decision to terminate Emmanuel's employment was based solely on this admitted misconduct, *see* Lara Dep. at 79-81. Emmanuel nonetheless argues that this explanation was merely a pretext for pregnancy discrimination because similarly situated coworkers were not terminated for engaging in the same misconduct. *See* Emmanuel Opp. at 15-17; *Clark v. Jewish Childcare Ass'n, Inc.*, ---F. Supp. 3d---, No. 12-cv-9372 (KMK), 2015 WL 1452134, at *13 (S.D.N.Y. Mar. 31, 2015) ("A plaintiff may show pretext by demonstrating that similarly situated employees outside the protected class were treated differently." (internal quotation marks omitted)). In support of this argument, Emmanuel affirms that (1) "in or about May 2010, [she] personally informed [Coger] that Justine Sierra, Receptionist, was sleeping on the couch in the reception area . . . and [Coger] did not take any

9

action against Justine Sierra"; and (2) "in or about May 2011, [Coger] personally observed Brille Williams, Receptionist, sleeping on the couch in the reception area . . . and also did not take any disciplinary action against her." Emmanuel Decl. at ¶¶ 4-5.

The above affirmations suffer from two preliminary deficiencies.  First, Emmanuel has not offered any evidence that Sierra and Williams were outside of her protected class—*i.e.*, that they were not pregnant—when purportedly sleeping in the reception area.  Absent such evidence, Coger's purported failure to discipline Sierra and Williams for sleeping in the reception area is not probative of discrimination.  *See Anderson v. GSF Mortgage Corp.*, 543 F. Supp. 2d 869, 875 (N.D. Ill. 2008) (finding that the plaintiff's failure to submit evidence demonstrating that a similarly situated coworker was not pregnant was "fatal" to the plaintiff's pregnancy discrimination claim).  Second, Emmanuel has provided no basis for concluding that her affirmation as to an observation made by Coger is based on personal knowledge, as required by Federal Rule of Civil Procedure 56(c) and Federal Rule of Evidence 602.

In any event, more importantly, Coger's purported failure to discipline Sierra and Williams for sleeping in the reception area is not probative of pretext because, as noted, it is undisputed that Coger was not involved in the decision to terminate Emmanuel's employment.  *See White v. Connecticut, Dep't of Corr.*, No. 3:08-cv-1168 (CFD), 2010 WL 3447505, at *6 (D. Conn. Aug. 24, 2010) ("To be considered similarly situated, an individual must have been treated more favorably by the same decisionmaker that dealt with the plaintiff."); *see also Smith v. Xerox Corp.*, 196 F.3d 358, 370-71 (2d Cir. 1999) ("Because intent is the critical issue [in disparate treatment cases], only a comparison between persons evaluated by the same decision-maker is probative of discrimination."), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006).  As a result, evidence that Coger treated employees who were not pregnant more favorably than Emmanuel does not impeach Lara's assertion that she terminated Emmanuel because Emmanuel fell asleep in the reception area.  And it is undisputed that, prior to the incident involving

Emmanuel, Lara had never received a complaint of an employee sleeping on the job. Lara Dep. at 96. Emmanuel thus cannot demonstrate that Lara's (and by extension, Cushman's) stated reason for her termination was a pretext for pregnancy discrimination.

Though not cited by the parties, the above analysis is supported by the Supreme Court's decision in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). There, the plaintiff brought a claim under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301 *et seq.*, which prohibits employers from discriminating against their employees based on their membership in the military, and which is "very similar" to Title VII. *Staub*, 562 U.S. at 416-17; *see also* 38 U.S.C. § 4311(c)(1) ("An employer shall be considered to have engaged in actions prohibited [by USERRA], if the person's membership . . . in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership."). The plaintiff alleged that his former employer had unlawfully terminated his employment under this statute because, in making the termination decision, the decisionmaker had relied on the reports of two supervisors who were hostile to his military obligations. *Staub*, 562 U.S. at 414.

In upholding the plaintiff's claim, the Supreme Court held that, "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 422 (emphasis and footnotes omitted). The Court indicated, however, that an employer can be held liable under such a "cat's paw" theory of discrimination only if the decisionmaker "relies on facts provided by the biased supervisor" in deciding to take an adverse employment action. *Id.* at 421; *see also id.* ("[T]he supervisor's biased report may remain a causal factor if the [decisionmaker's] independent investigation takes it into account without determining that the adverse action was, apart from the [biased] supervisor's recommendation, entirely justified."). Absent such reliance, the supervisor's biased act should not

be considered a proximate cause of the adverse employment action. *See Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1294 (10th Cir. 2013) ("The [Supreme] Court [in *Staub*] did not specify which element is missing absent reliance on facts from the biased supervisor, but it is plain that the element is proximate cause."); *see also CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2637 (2011) ("The term 'proximate cause' is shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability. . . . [B]ecause of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point." (internal quotation marks omitted)).

It is evident that, under *Staub*, Emmanuel cannot establish that her pregnancy was a motivating factor in Lara's decision to terminate her employment based on any anti-pregnancy bias on the part of Coger. Although the record suggests that Coger reported to Lara the allegation that Emmanuel had been sleeping on a couch in the reception area during business hours, *see* Coger Dep. at 66-67, it is undisputed that Emmanuel subsequently admitted to Lara that she had, in fact, slept on a couch in the reception area during business hours, *see* Lara Decl. at ¶ 5; Emmanuel Dep. at 176-77; *see also* Dkt. No. 32-13 (Emmanuel's termination letter) (stating that Emmanuel had "admitted that [she was] sleeping on the couch"). Consequently, Lara was not required to "rel[y] on facts provided by the biased supervisor" (Coger) in deciding to terminate Emmanuel's employment, and any biased conduct on the part of Coger should not be deemed a proximate cause of Lara's termination decision. *Staub*, 562 U.S. at 421; *see also Lobato*, 733 F.3d at 1295 (concluding that, under *Staub*, "an employer is not liable under a subordinate bias theory if the employer did not rely on any facts from the biased subordinate in ultimately deciding to take an adverse employment action— even if the biased subordinate first alerted the employer to the plaintiff's misconduct"). Accordingly, extending the decision in *Staub* to the present context, Emmanuel cannot establish that her employment was terminated based on her pregnancy through evidence of Coger's discriminatory

animus or conduct, and Defendants' summary judgment motion is granted with respect to Emmanuel's Title VII pregnancy discrimination claims.

### C.     Title VII Retaliation Claims

Where, as here, there is no direct evidence of retaliation, retaliation claims under Title VII are also analyzed under the *McDonnelll Douglas* framework described above. *Flanagan v. N. Shore Long Island Jewish Health Sys.*, No. 11-cv-5246 (JFB), 2014 WL 4905124, at *9 (E.D.N.Y. Sept. 30, 2014) (citing *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)).  Under this framework, a plaintiff must first establish a *prima facie* case of retaliation by showing that (1) she engaged in a protected activity; (2) the defendant was aware of that activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013).  If the plaintiff establishes a *prima facie* case of retaliation, then the burden shifts to the defendant to provide a legitimate, non-retaliatory reason for the adverse employment action. *Kirkland*, 760 F.3d at 225.  Where the defendant articulates such a reason, "the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for . . . retaliation." *Id.*  Ultimately, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

Here, the Court will simply assume, *arguendo*, that Emmanuel can establish a *prima facie* case of retaliation, especially given the relatively close temporal proximity between the alleged protected conduct—Emmanuel's January 2012 Facebook post complaining of pregnancy discrimination[8]—

---

[8] The Court nonetheless notes that it is not clear whether Emmanuel engaged in protected conduct by posting a message complaining of discrimination to Facebook while at work during business hours.  While the term "protected conduct" has been expansively construed, "not all forms of protest are protected by Title VII's prohibition on retaliation." *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000).  The Second Circuit has suggested, for instance, that "the way in which an employee presses complaints of discrimination can be so disruptive or insubordinate that it strips away protections against retaliation," and that "[a]n employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of

and the adverse employment action at issue—Emmanuel's March 2012 termination. *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) ("In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." (internal quotation marks omitted)). The Court agrees with Defendants, however, that Cushman has articulated a legitimate, non-retaliatory reason for Emmanuel's termination—her admitted falling asleep in the reception area during business hours—and that Emmanuel cannot establish that this explanation was a pretext for retaliation. *See* Def. Mot. at 19. "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). Additionally, for the reasons already stated, Coger's purported failure to discipline two of Emmanuel's former co-workers for engaging in the same misconduct as Emmanuel does not indicate that Cushman's explanation for Emmanuel's termination was pretextual.

In the relevant portion of her opposition brief, apart from highlighting the close temporal proximity between her Facebook post and termination, Emmanuel relies on (1) evidence purportedly suggesting that she received a disciplinary warning based on the content of her January 2012 Facebook post, and not based on her violation of Cushman's policy forbidding posting on social media during business hours; and (2) evidence purportedly suggesting that other employees were not disciplined for posting on Facebook during business hours. *See* Emmanuel Opp. at 11-14.

---

commotion, and conducive to the work of the enterprise." *Id.* Cushman had a policy prohibiting employees from posting on social networking sites during business hours, *see* Dkt. No. 32-10, which is a reasonable means of maintaining a workplace environment that is "conducive to the work of the enterprise." As a result, protesting discrimination through a Facebook post made during business hours in violation of this policy may not be protected under Title VII. Ultimately, however, the Court is not required to resolve this issue, as Emmanuel's Title VII retaliation claims are subject to dismissal for the reasons indicated below.

But such evidence does not indicate that Cushman's explanation for Emmanuel's *termination* was pretextual, and Emmanuel has not argued or even asserted that the written warning she received for posting on Facebook during business hours constituted an adverse employment action, even in response to Defendants' argument that it did not.  *See* Def. Mot. at 12-13.

Moreover, even if the Court were to overlook this deficiency, the evidence does not permit a finding that Cushman's stated reason for issuing a written warning to Emmanuel—that she violated an employer policy by posting on a social networking site during business hours—was a pretext for retaliation.  With respect to the arguments to the contrary described above, Lara, who was solely responsible for issuing the written warning, testified that she sought the approval of Human Resources to do so both because she believed that Emmanuel's Facebook post was "gear[ed] towards" the specific employee who had reported the post, and because of "the time that [the post] occurred," which was "during business hours."  Lara Dep. at 90-91.  Additionally, Emmanuel has not presented any competent evidence of specific instances in which similarly situated co-workers outside of her protected class were not disciplined for posting on Facebook during business hours.  Emmanuel thus cannot establish that Cushman's explanations for either her termination or the written warning she received for posting on Facebook, and Defendants' summary judgment motion is granted with respect to Emmanuel's retaliation claims under Title VII.

### D. NYCHRL Claims

Federal district courts have supplemental jurisdiction over state law claims "that are so related to" federal claims "that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  Such jurisdiction, however, is "discretionary," *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a district court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c).

"The NYCHRL explicitly requires an independent liberal construction analysis in all circumstances, an analysis that must be targeted to understanding and fulfilling what the statute

characterizes as the [NYCHRL's] uniquely broad and remedial purposes, which go beyond those of counterpart state or federal civil rights laws." *Armstrong v. Metro. Transp. Auth.*, No. 07-cv-3561 (DAB), 2015 WL 992737, at *5 (S.D.N.Y. Mar. 3, 2015) (internal quotation marks omitted); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) ("[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." (citation and internal quotation marks omitted)). As a result, courts in this District frequently decline to exercise supplemental jurisdiction over NYCHRL claims, *see, e.g., Vuona v. Merrill Lynch & Co., Inc.*, 919 F.Supp.2d 359, 393–94 (S.D.N.Y. 2013) (resolving NYSHRL claims together with Title VII claims, while declining to exercise supplemental jurisdiction over NYCHRL claims); *Brown v. City of New York*, No. 14-cv-2668 PAE, 2014 WL 5394962, at *8 n. 8 (S.D.N.Y. Oct. 23, 2014) (same); *Guzman v. City of New York*, No. 1:13-cv-5445 (GHW), 2015 WL 1239988, at *13 (S.D.N.Y. Mar. 18, 2015) (same).

In light of this law and the Court's dismissal of all of Emmanuel's federal claims, the Court declines to exercise supplemental jurisdiction over Emmanuel's claims under the NYCHRL.

### III. Conclusion

For the foregoing reasons, Defendants' summary judgment motion is granted with respect to Emmanuel's Title VII claims and those claims are dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Emmanuel's NYCHRL claims and dismisses those claims without prejudice. The Clerk of Court is instructed to enter judgment accordingly and to close the case.

SO ORDERED.

Dated: August 26, 2015
New York, New York

GREGORY H. WOODS
United States District Judge